In the

# United States Court of Appeals

### For the Seventh Circuit

Nos. 06-2283, 06-2549 and 06-2575

VIRGEAN HOUSKINS,

*Plaintiff-Appellee,*

*v.*

MICHAEL F. SHEAHAN, Sheriff, The Sheriff of
Cook County, sued in his official capacity,
COOK COUNTY and DONALD KEITH,

*Defendants-Appellants.*

Appeals from the United States District Court
for the Northern District of Illinois, Eastern Division.
No. 03 C 6553—**Milton I. Shadur**, *Judge.*

ARGUED NOVEMBER 9, 2007—DECIDED NOVEMBER 25, 2008

Before BAUER, MANION and WILLIAMS, *Circuit Judges.*

BAUER, *Circuit Judge.* Social worker Virgean Houskins
brought a civil rights action under 42 U.S.C. § 1983 against
her employer, then-Sheriff Michael Sheahan and Cook
County (collectively the "Sheriff"), alleging that she was
disciplined in retaliation for reporting a fight between
her and Correctional Officer Donald Keith. She further
alleged the Sheriff had a widespread custom or policy

of retaliating against employees of the Cook County Department of Corrections ("CCDOC") who exercised their right to free speech. Houskins also filed a claim under Illinois state law for civil assault and battery against Keith. A jury returned a verdict in favor of Houskins, awarding damages against the Sheriff and Keith; these appeals followed. For the reasons set forth in this opinion, we affirm the judgment against Keith and reverse the judgment against the Sheriff.

## I. BACKGROUND

Beginning in 1990, Houskins was a social worker for the Sheriff in the Department of Program Services at the CCDOC. On the morning of September 17, 2001, Houskins arrived at work and pulled into the parking lot of the Cook County jail. The lot was full, and while she waited for a parking space, Houskins chatted with co-worker Regina Bowers, who was sitting in the car next to Houskins. Keith pulled into the parking lot shortly thereafter. As Keith drove past her, Houskins thought Keith was going to take the parking spot she had been waiting for, and stated, "oh, mother fuck, no he won't do this." Keith overheard Houskins through the open car windows.

Keith took the parking space and Houskins parked her car in another space nearby. Both exited their cars and approached one another. A verbal argument ended with Keith striking Houskins in the face. Bowers was present for the argument and saw Keith strike Houskins. Two more correctional officers, Claude Lawrence and Dennis Calderone, arrived on the scene moments after the incident, but neither witnessed Keith striking Houskins.

According to Houskins, Lawrence came over and told her to "shut the fuck up" and "nobody was going to lose their job" over the incident; Calderone walked away from the area.

After the altercation ended, Houskins reported for duty. On the advice of two lieutenants, she filed a CCDOC incident report in which she described the attack. Houskins went to the emergency room at Cermak Health Services, where doctors examined her, took x-rays, and ordered her to apply cold packs to her right jaw and take Tylenol for any pain.

Under the CCDOC General Orders, which set forth policy, procedure, and requirements of conduct for CCDOC employees, it was Houskins's obligation to report incidents of misconduct immediately to her supervisor. So, after leaving Cermak, Houskins recounted the incident to her supervisor, Patricia Tolbert, including her use of foul language and Keith's attack. Tolbert took Houskins, along with Bowers, to the Internal Affairs Division ("IAD") to make a complaint against Keith, Lawrence, and Calderone. Houskins gave her statement to investigators, repeating the story about her use of foul language, the argument, Keith's attack, and Lawrence's and Calderone's responses. IAD began the investigation shortly thereafter. The day after the incident, Keith was de-deputized, or stripped of his duties as a correctional officer, as a result of the complaint Houskins filed against him.

On the same day she reported the incident to IAD, Houskins went to the emergency room at the University of Illinois at Chicago Hospital for head pain and later

filed a police report, attempting to have Keith arrested for assault and battery.[1] According to Houskins, she also contacted the Cook County State's Attorney's Office in October and left a message for an assistant state's attorney regarding criminal charges being filed against Keith, but no one returned her phone call and she did not follow up.

On December 14, 2001, the IAD completed its investigation into the Houskins/Keith incident. IAD Investigator Gregory Ernst found that the evidence was "inconclusive" against Keith, Calderone, and Lawrence. However, Ernst "sustained" the investigation into Houskins's conduct, finding that Houskins used obscene language in violation of General Order 3.8 § III D-1 of the CCDOC Ethics and Standards of Conduct, which states that employees must conduct themselves in a professional and ethical manner, both on and off duty, and "[e]mployees will refrain from the use of abusive or obscene language, threats, and coercion." On January 3, 2002, Tolbert received Ernst's report and recommended that Houskins receive a three-day suspension.[2]

---

[1] The police report indicated that Houskins "stated [that the incident] would be handled internally by [the] county," however Houskins denied making this statement to police. Criminal charges were never filed against Keith.

[2] General Order 4.1 applies to internal investigations within the CCDOC. Section III defines guidelines for "serious misconduct" of CCDOC employees that warrants investigation and disciplinary action, "[i]nclud[ing] misconduct while an employee is off duty/outside the institution . . .". Section (G)(11)
(continued...)

Ernst also submitted the results of his investigation for command channel review—an additional review by the Office of the Inspector General ("OIG"), which oversees IAD's investigations. Deputy Inspector Henry Barsch and Inspector General Joseph Shaughnessy of the OIG reviewed the IAD's investigation and Tolbert's recommendation to suspend Houskins for three days. On January 25, 2002, OIG concurred with the findings and penalties against Houskins, but reversed IAD's findings with regard to Keith and Calderone, concluding that, by the preponderance of the evidence, (1) Keith struck Houskins in the face, in violation of General Order 4.1 § III (A)(10) and (A)(17),[3] and (2) Calderone failed to take action during the altercation, in violation of General Order 9.23 § III(A)(8).[4] OIG recommended a suspension of twenty-nine days for Keith and three days for Calderone. OIG

---

[2] (...continued)

states that when the IAD investigation is classified as "sustained," the divisional Superintendent/Unit Head may recommend a) written reprimand; b) suspension; or c) severance from duty.

[3] General Order 4.1 § III(A) states "Guidelines for serious misconduct include, but are not limited to . . . (10) [i]nmate, employee or visitor abuse . . . (17) [e]ngag[ing] in any conduct unbecoming an employee of the [CCDOC] which tends to reflect discredit on the [CCDOC] or [the Sheriff]."

[4] General Order 9.23 § III(A)(8) states, in pertinent part, that the responsibilities of sergeants employed at CCDOC include "provide fair and equitable supervision standards to personnel under their authority, and initiate corrective action when applicable."

forwarded its findings up the chain of command channel review to Executive Director Ernesto Velasco, and then to Undersheriff Zelda Whitler; both concurred with the findings and recommendations in early February 2002.

Houskins received a memo from Tolbert in July 2002, notifying her of her suspension without pay from July 30 to August 1, 2002. Houskins served the three-day suspension; eventually Houskins and Keith initiated the grievance process under their respective Union Collective Bargaining Agreements. Keith's suspension was ultimately reduced to one day; Houskins's suspension was reduced to a written reprimand and she was reimbursed for the three-day suspension.

On September 16, 2003, Houskins filed a complaint in federal district court, alleging a First Amendment violation against Sheahan in his official capacity and against Cook County. She claimed that (1) the Sheriff retaliated against her in violation of her First Amendment rights, because, as a direct result of her filing a complaint and police report against Keith, she was charged with a violation of General Order 3.18 and suspended, and that Keith was neither disciplined nor reprimanded for striking Houskins; (2) a policy existed that officers in the CCDOC abide by a "code of silence" when faced with testifying against a fellow officer; this custom and policy also meant that those employees who do not abide by this "code" (such as Houskins) are subject to retaliatory actions; and (3) Sheahan employs a policy of selective discipline that exempts officers with "clout" from reprimands or discipline for misconduct under the General Orders, but those who lack influence are subject to retaliation.

Houskins also alleged state law claims of assault and battery against Keith.

## A. District Court Proceedings—The Sheriff

On September 23, 2004, the Sheriff filed a motion for summary judgment, arguing that it was entitled to judgment as a matter of law because Houskins's speech regarding the disciplinary process at the jail was not a matter of public concern under the *Connick-Pickering* test. The Sheriff also argued that no genuine issue of material fact existed to prove that either the Sheriff had a policy or practice of retaliating against employees who exercise their right to free speech, or engaged in a policy of selective discipline. The district court denied the motion on October 4, 2004, without prejudice to its possible renewal at trial as a Rule 50 motion. That same day, the final pre-trial order was entered, in which the Sheriff did not raise the issue of whether Houskins's speech was constitutionally protected.

At a status hearing on April 7, 2005, counsel for the Sheriff alerted the court that it had not yet addressed the issue of whether Houskins's speech was constitutionally protected. The court stated that it was unaware that such an important question remained unanswered and expressed its frustration that the final pre-trial order did not contain any language identifying the contested issue. The court held that the Sheriff had forfeited the argument because it had not raised the issue in the final pre-trial order, and therefore it could not include it in opening or closing statements, nor could it request a jury instruction on the issue.

The Sheriff filed a motion to reconsider on April 25, 2005, once again asking the court to make a determination as a matter of law as to whether Houskins's speech was constitutionally protected. The court denied the motion to reconsider on June 16, 2005, finding that the final pre-trial order did not properly identify the issue. The court stated, "You know there is nothing to prevent, for example, when an issue is to be identified, a final pre-trial order gets amended on the party's motion. They say, 'Look. This is an item that we want to add.' " When counsel for the Sheriff inquired whether they may still raise the issue in a Rule 50 motion at the close of Houskins's case, the court ruled that the issue of whether the speech was constitutionally protected had not been preserved.

The case went to trial and the following is a summary of the facts pertinent to our analysis.

Houskins testified that she spoke out about the incident almost every day to anyone that would listen, and that after the incident, she saw Keith twice and both times he told her that "nothing would happen" to him. She stated that she was treated differently or ignored by the correctional officers at the jail, and sometime in 2005, she saw Keith at work, and became so upset that she told her supervisor that she "couldn't take it" anymore. She also testified about an incident in 1999, where she observed a correctional officer beat up an inmate while another officer watched, and she was not aware of the officers reporting the incident. (Houskins could not identify any of the officers by name.) Houskins also testified to her belief that "a code of silence" existed

within the Sheriff, because she had observed other officers violate General Orders in the past, but no officer fulfilled his or her duty to report incidents. According to Houskins, profanity was used frequently by employees at the jail without repercussion.

Houskins's co-workers Susie Richardson, Regina Bowers, and Lester Hampton, Jr. took the stand at trial. Richardson testified that Houskins had complained when Tolbert gave her a three-day suspension. Richardson stated that Houskins made it known to everybody in her department, including Tolbert, that she was not happy with Tolbert's decision to discipline her. Richardson also stated that she too had been subjected to retaliatory acts from her supervisors, most recently two weeks before she testified in the current case.

Regina Bowers stated she talked to Houskins about the incident every day. Lester Hampton, Jr. testified that Houskins told him the investigation would not be conducted in a fair and objective manner. Hampton also testified that profanity is part of the culture at the jail, and that the majority of employees use profanity on a daily basis without facing discipline.

Investigator Ernst and Deputy Inspector General Barsch testified about the results of their respective investigations. Houskins presented evidence, through Barsch, that OIG maintains a case management system, or "database" that was developed to track investigations by IAD and the outcomes of these investigations. The database kept information such as the name of the accuser, the date the case was received, an investigation number, the nature of

the claim (e.g., verbal abuse), and the outcome of the investigation (e.g., whether the findings were sustained, inconclusive, exonerated or unfounded), within the time frame of 1996 to 2003. Houskins used the database to show that out of more than 2000 investigations, only twelve employees were charged with verbal abuse, and that the only two employees actually disciplined for that offense (one of whom was Houskins) were not officers.

Tolbert testified that when she made the decision to suspend Houskins for three days, she did not base her decision on the fact that Houskins had filed an internal complaint about the incident. Tolbert stated that she based her decision on Houskins's past problems with supervisors, use of unprofessional language on the job (all of which had been pointed out to Houskins in the past), and finally, her concern that Houskins's language had escalated to the point where someone had been injured. Tolbert denied that Velasco told her what discipline to impose on Houskins.

Throughout the trial, counsel for the Sheriff objected to most of the evidence concerning Houskins's conversations with co-workers about the Sheriff's investigation of the incident. The court stated that it was aware of the problem regarding the public concern issue, and although it had "knocked out a lot of these cases on precisely [the issue of whether speech was a matter of public concern] . . . the problem is that this case got generated and presente[d] in a different way, and [the court could not] undo that."

Twice during the trial, outside of the presence of the jury, the court *sua sponte* raised the speech issue while com-

menting on how Houskins would be able to prove policy or practice to establish municipal liability. The court stated, "[t]he kind of things [pattern or policy] that we are talking about now would assist enormously a defendant, for example, in connection with seeking a dispositive motion on grounds that it failed to meet the first step of the analysis [related to protected speech]." Another time, the court stated that it was "troubled" by Houskins's presentation and considered releasing the jury to "deal with this thing as a legal matter."

At the conclusion of Houskins's case, the Sheriff moved for judgment as a matter of law, which the court took under advisement. At the close of evidence, the Sheriff stated that "we have our Rule 50 motion of course, and we will be doing that," to which the court replied, "of course."

On March 3, 2006, the jury returned a verdict against the Sheriff for $240,000 in compensatory damages, and the court entered judgment on the verdict on March 8, 2006. The Sheriff filed a post-judgment renewal of its motion to enter judgment as a matter of law under Rule 50(b), arguing that Houskins failed to prove policy, custom or practice.[5] In denying the motion, the court noted that the Sheriff had failed to renew its Rule 50 motion at the

---

[5]  At oral argument, the Sheriff stated that the issue of whether Houskins's speech was constitutionally protected was not included in its renewed post-judgment motion because the court told the Sheriff before trial not to include the issue in a Rule 50 motion, due to its failure to preserve it in the final pre-trial order.

close of evidence, and deferred to Houskins's response to the Rule 50(b) motion for the substance of his ruling. The Sheriff and Keith filed these timely appeals.

## II. DISCUSSION

### A. The Sheriff

On appeal, the Sheriff argues that the Houskins's speech was not a matter of public concern under *Garcetti v. Ceballos*, 547 U.S. 410, 126 S.Ct. 1951, 164 L.Ed.2d 689 (2006), because Houskins was a public employee speaking pursuant to official job duties, and therefore the speech was not protected under the First Amendment. The Sheriff maintains that the issue of whether speech is protected is a matter of law that the district court failed to address, and therefore the court erred in denying its motion for summary judgment. The Sheriff also argues that the jury verdict imposing municipal liability under *Monell* cannot stand, where no final policymaking official caused Houskins's alleged injury, and the jury did not have a legally sufficient evidentiary basis to conclude that Houskins's alleged constitutional injury resulted from widespread customs within the Sheriff's Department.

Before we reach the Sheriff's arguments, we must clear a few procedural hurdles. The Sheriff requests that we review the district court's denial of its motion for summary judgment; Houskins responds that the denial of this motion is unreviewable on appeal. Further, Houskins believes that the Sheriff has waived the issue of whether Houskins's speech was constitutionally protected, because

the Sheriff's renewed Rule 50(b) motion—the final decision creating jurisdiction for this appeal—only preserved the issue of whether there was sufficient evidence of a practice or custom of retaliation to send the issue to the jury, and the Sheriff failed to move for judgment as a matter of law on the issue of constitutionally protected speech.

Generally after a trial on the merits, we will not review the district court's earlier denial of a motion for summary judgment that is based on the sufficiency of the evidence. *Chemetall GMBH v. ZR Energy, Inc.*, 320 F.3d 714, 718-19 (7th Cir. 2003). In *Chemetall*, we held that we follow this rule because a denial of summary judgment is a prediction that the evidence will be sufficient to support a verdict in favor of the nonmovant. *Id.* at 718. Once the trial has taken place, our focus is on the evidence actually admitted and not on the earlier summary judgment record. "After trial, the merits should be judged in relation to the fully-developed record emerging from that trial [and] [w]e will not at that point step back in time to determine whether a different judgment may have been warranted on the record at summary judgment." *Id.* at 718-19 (citing *Watson v. Amedco Steel, Inc.*, 29 F.3d 274, 278 (7th Cir. 1994)). Therefore, in order to preserve for appeal a challenge to the sufficiency of the evidence, the challenge must be raised in a Rule 50(a) motion for judgment as a matter of law before the case is submitted to the jury. *Chemtall*, 320 F.3d at 719.

However, when, as in this case, the court's denial of summary judgment is not based on the adequacy of the evidence, the justification does not apply. *Id.* (reviewing

a district court's denial of a motion for summary judgment, notwithstanding the party's failure to raise it in a motion for judgment as a matter of law at trial, where the motion raised legal issues other than the sufficiency of the evidence); *see also Fuesting v. Zimmer*, 448 F.3d 936, 941 (7th Cir. 2006) (noting that if there are errors at trial duly objected to, that deal with matters other than sufficiency of the evidence, they may be raised on appeal even though there had not been either a renewed motion for judgment as a matter of law or a motion for a new trial) (citing 9A CHARLES ALAN WRIGHT AND ARTHUR R. MILLER, FEDERAL PRACTICE AND PROCEDURE § 2540 (2d ed. 1995)). While we owe deference to the jury's resolution of the contested factual issues, the determination of whether speech is constitutionally protected is a question of law for the court. *Connick v. Myers*, 461 U.S. 138, 150 n. 10, 103 S.Ct. 1684, 75 L.Ed.2d 708 (1983); *Spiegla v. Hull*, 481 F.3d 961, 965 (7th Cir. 2007) (*Spiegla II*) (inquiry into protected status of speech is a matter of law, not of fact) (citing *Connick*, 461 U.S. at 148 n. 7, 103 S.Ct. 1684). Further, including the issue of law in a Rule 50 motion would defeat its purpose, which is to challenge the sufficiency of the evidence rather than the propriety of questions of law. *See Winters v. Fru-Con Inc.*, 498 F.3d 734, 745-46 (7th Cir. 2007) ("Under Rule 50, a court should grant judgment as a matter of law when a party has been fully heard on an issue and there is no legally sufficient evidentiary basis for a reasonable jury to find for that party on that issue."). By raising the legal issue in its motion for summary judgment, as well as by subsequent motions and objections throughout trial, the Sheriff sufficiently preserved the issue for our review.

Houskins also argues that the Sheriff failed to raise the issue in the final pre-trial order, thus barring our review. Nothing in the Federal Rules of Civil Procedure, however, tells attorneys that, in order to preserve issues for appeal, they must insert into the final pre-trial order contentions that have already been rejected by the judge. *Calderon v. Witvoet*, 999 F.2d 1101, 1108 (7th Cir. 1993) (holding that defendants did not waive a statute of limitations defense by failing to include it in a pre-trial order because the district court had already ruled against the defendants on that issue in their answer to the complaint and in their opposition to the plaintiffs' motion for summary judgment). We therefore hold that the Sheriff's failure to include the issue of protected speech in the final pre-trial order is not fatal to its claims on appeal. The issue of whether Houskins's speech was constitutionally protected is a matter of law that the district court failed to address, and the issue was sufficiently raised in the Sheriff's motion for summary judgment. We now turn to the merits.

### 1.  The *Garcetti* Issue

"[T]he First Amendment protects a public employee's right, in certain circumstances, to speak as a citizen addressing matters of public concern." *Morales v. Jones*, 494 F.3d 590, 595 (7th Cir. 2006). A § 1983 claim that alleges a defendant retaliated in response to a plaintiff's proper exercise of her First Amendment rights must satisfy a three-step test in order to survive summary judgment. *Phelan v. Cook County*, 463 F.3d 773, 790 (7th Cir. 2006). The

first step is assessing whether the plaintiff's speech is constitutionally protected. *Id.* Next, the court must assess whether the plaintiff has demonstrated that the alleged retaliatory activity was motivated by the constitutionally-protected speech. *Id.* Finally, if the plaintiff satisfies the first two steps, the court must assess whether the defendant has demonstrated that it would have taken the same action irrespective of the plaintiff's speech. *Id.*

In order to determine the first step, courts usually referred to the *Connick-Pickering* test—whether the employee spoke as a citizen on a matter of public concern, and if so, her interest as a citizen in commenting on the matter of public concern outweighed the State's interest in promoting effective and efficient public service. *Spiegla II*, 481 F.3d at 965. The Supreme Court in *Garcetti* provided further guidance as to when a public employee can be considered, for First Amendment purposes, to be speaking as a citizen. The Court held that "when public employees make statements *pursuant to their official duties*, the employees are not speaking as citizens for First Amendment purposes, and the Constitution does not insulate their communications from employer discipline." *Garcetti*, 547 U.S. at 421, 126 S.Ct. 1951 (emphasis added). Therefore, *Garcetti* (issued after the district court proceedings ended in this case) requires courts to first decide whether a plaintiff was speaking "as a citizen" or as part of her public job, before asking whether the subject-matter of particular speech is a topic of public concern. *Mills v. City of Evansville, Indiana*, 452 F.3d 646, 648 (7th Cir. 2006) (citing *Garcetti*, 547 U.S. at 421, 126 S.Ct. 1951). Determining the official duties of a public employee requires a practical inquiry into what duties the employee is expected to

perform, and is not limited to the formal job description. *Vose v. Kliment*, 506 F.3d 565, 569 (7th Cir. 2007) (citing *Garcetti*, 547 U.S. at 425; 126 S.Ct. 1951). While "[t]he fact that an employee has a personal stake in the subject matter of the speech does not necessarily remove the speech from the scope of public concern," *Phelan*, 463 F.3d at 791 (quoting *Button v. Kibby-Brown*, 146 F.3d 526, 529 (7th Cir. 1998)), the "public concern" element must relate to a community concern and is not satisfied by "merely a personal grievance of interest only to the employee." *Sullivan Ramirez*, 360 F.3d 692, 699 (7th Cir. 2004) (citation omitted). We review *de novo* whether Houskins's statements qualify for protection under *Garcetti*. *Callahan v. Fermon*, 526 F.3d 1040, 1044 (7th Cir. 2008).

Like the defendant in *Spiegla II*, the Sheriff did not have the benefit of making a proper *Garcetti* argument, in that the motion was filed two years before *Garcetti*. *See Spiegla II*, 481 F.3d at 964. The Sheriff did, however, make a *Garcetti*-type argument in their motion for summary judgment, arguing that, under *Connick* and *Pickering*, Houskins's "statement/conduct and CCDOC's response are not a matter of public concern; rather it is a matter of employer housekeeping matters," and "while Plaintiff's grievances are of a private concern and important to her; however, they are not of a public concern which invoke the protections of the First Amendment." We find this sufficient to preserve the issue and consider the Sheriff's argument that Houskins's speech was not protected under the First Amendment because it was made pursuant to her official duties as an employee of the Sheriff.

Houskins's complaint sets forth two different instances in which she attempted to speak out on matters of public concern and was subsequently disciplined by the Sheriff as a direct result of that speech. Houskins complained that as a direct result of the internal complaint and the police report she filed against Keith, she was charged with a violation of the General Orders.

We first address the internal complaint made by Houskins, which we conclude is an obvious form of speech made pursuant to official duties under the *Garcetti* standard; it would require mental gymnastics to see it otherwise. "Restricting speech that owes its existence to a public employee's professional responsibilities does not infringe any liberties the employee might have enjoyed as a private citizen. It simply reflects the exercise of employer control over what the employer itself has commissioned or created." *Garcetti*, 547 U.S. at 421-22, 126 S.Ct. 1951; *see e.g., Sigsworth v. City of Aurora, Illinois*, 487 F.3d 506, 510-11 (7th Cir. 2007) (finding that a detective's report on suspicions of misconduct within the police department were made within his capacity as an investigator and a task force member, and therefore he did not speak as a citizen on a matter of public concern); *Spiegla II*, 481 F.3d at 965-66 (finding that a plaintiff's report of fellow officers' suspicious activity was made pursuant to the plaintiff's responsibility as a prison correctional officer to inform her superiors of a possible breach in prison search policy); *Mills*, 452 F.3d at 648 (holding that a police sergeant's vocal criticisms about her boss's personnel decision were made in her capacity as a public employee contributing to the forma-

tion and execution of official policy). Almost immediately after the incident in the parking lot, Houskins filed the complaint with IAD, fulfilling her responsibility as a CCDOC employee to report incidents of misconduct immediately to her supervisor, pursuant to the General Orders.[6] Houskins was clearly expected to report the incident under the General Orders, and therefore she was speaking as part of her job as an employee of the Sheriff, and not as a citizen. *See id*. As such, she does not enjoy First Amendment protection of that speech.

We turn now to the police report. As we mentioned earlier, the critical inquiry under *Garcetti* is whether Houskins engaged in the relevant speech pursuant to her official duties. Houskins's statements to the police were not made pursuant to her job, as the report was not generated in the normal course of her duties and most likely was similar to reports filed by citizens every day. *See Garcetti*, 547 U.S. at 422, 126 S.Ct. 1951(citing *Pickering v. Board of Ed. of Township High School Dist. 205, Will Cty.*, 391 U.S. 563, 88 S.Ct. 1731, 20 L.Ed.2d 811 (1968)); *see also Frietag v. Ayers*, 468 F.3d 528, 545 (9th Cir. 2006) (emphasiz-

---

[6] General Order 3.8 § III (G) states that "[i]t shall be the responsibility of every employee to immediately report to their divisional Superintendent/Unit Head and the department Internal Investigations Unit verbally and in writing, any fact or situation which may give rise to or be construed as corrupt, illegal or unethical behavior and/or possible conflict of interest. This shall include, but not be limited to, reporting anything which could impair the employee's performance of their duties in a fair and impartial manner."

ing that the "right to complain both to an elected public official and to an independent state agency is guaranteed to any citizen in a democratic society regardless of his status as a public employee.").

Houskins was not, however, speaking about matters of public concern. Speech that serves a private or personal interest, as opposed to a public one, does not satisfy the standards for First Amendment protections. *Boyce v. Andrew*, 510 F.3d 1333, 1344 (11th Cir. 2007) ("The relevant inquiry is not whether the public would be interested in the topic of the speech at issue but rather is whether the purpose of the plaintiff's speech was to raise issues of public concern.") (internal quotations and citation omitted). The police report was nothing more than Houskins's personal grievance against Keith in order to have him arrested for striking her. She reported the incident in the police report as a simple "battery" and she related to an officer that Keith struck her in the face and then left the scene. Houskins's statements in the report were tied to a personal employment dispute; there is nothing in the record to indicate that Houskins's purpose in filing the police report was to bring to light any wrongdoing by the Sheriff, *e.g.,* to raise public awareness about the safety of the employees within the CCDOC or to uncover a policy of selective discipline or clout within the CCDOC. *See Connick*, 461 U.S. at 148, 103 S.Ct. 1684 (emphasizing that statements not a matter of public concern where employee was not seeking to inform the public that government agency was not discharging its responsibilities and was not bringing to light actual or potential wrongdoing or breach of the public trust on the part of

another public official); *Glass v. Dachel*, 2 F.3d 733, 741 (7th Cir. 1993) (noting that "matters of public concern do include speech aimed at uncovering wrongdoing or breaches of the public trust").

Because we are reviewing the denial of summary judgment, we need not consider Houskins's theory (that emerged throughout the trial) that she was allegedly retaliated against for conversing with her co-workers; nevertheless, we briefly address the contention. Houskins does not lose her right to speak as a citizen simply because she initiated the conversations at work or because they related to the subject matter of her employment. "Many citizens do much of their talking inside their respective workplaces, and it would not serve the goal of treating public employees like 'any member of the general public,' to hold that all speech within the office is automatically exposed to restriction." *Garcetti*, 547 U.S. at 420-21, 126 S.Ct. 1951 (internal citation omitted). However, "we have cautioned that if every facet of internal operations within a governmental agency were of public concern, and therefore any employee complaint or comment upon such matters constitutionally protected, no escape from judicial oversight of every governmental activity down to the smallest minutia would be possible." *Kuchenreuther v. City of Milwaukee*, 221 F.3d 967, 974-75 (7th Cir. 2000). Once again, Houskins's statements to her co-workers addressed personal matters—her dissatisfaction with the

investigation.[7] *See e.g.*, *Connick*, 461 U.S. at 149, 103 S.Ct. 1684 (holding that an assistant district attorney's complaints relating to intra-office policies, office morale, and grievance procedures were "internal office affairs," not speech on matters of public concern, and thereby it was not entitled to First Amendment protection).

After careful review of the summary judgment record, we find that Houskins's speech was not protected by the First Amendment and the Sheriff was entitled to a judgment as a matter of law under Fed. R. Civ. P. 56(c). Accordingly, we hold that the Sheriff did not violate Houskins's constitutional rights, and the court erred in denying the Sheriff's motion for summary judgment.[8]

---

[7] Even if we reviewed the evidence after a denial of a motion for judgment as a matter of law, the record is devoid of any evidence that the Sheriff retaliated against Houskins for her conversations with co-workers. Indeed, Richardson's testimony indicated that Houskins complained about her three-day suspension, therefore her suspension could not be a direct result of those conversations. Further, there was not a scintilla of evidence that her other complaints to co-workers about the manner of the investigation were even acknowledged or heard by her superiors at CCDOC.

[8] Houskins raised the issue during oral argument that our review of the denial of summary judgment would prejudice her, because she did not have the opportunity to file a response to the motion before the court denied it without prejudice. However we cannot think of any conceivable way that Houskins could have presented evidence to refute the fact that her

(continued...)

## 2. *Monell*

The Sheriff also challenges the district court's denial of its Rule 50(b) motion, arguing that no final policymaking official caused Houskins's alleged injury and there was insufficient evidence to conclude that the Sheriff had a policy of retaliating against protected speech. We review a district court's denial of judgment as a matter of law *de novo*. *Filipovich v. K & R Express Sys., Inc.*, 391 F.3d 859, 863 (7th Cir. 2004). "Our job is to assure that the jury had a legally sufficient evidentiary basis for its verdict." *Id*. "Unlike our review of a summary judgment motion, however, review of a Rule 50 motion proceeds on the basis of the evidence the jury actually had before it. We will overturn a jury verdict only if, after reviewing the evidence, it is clear that the plaintiff failed to present enough evidence to support her claim." *Id*.

"While a municipality is not vicariously liable under § 1983 for the acts of its employees, a constitutional deprivation may be attributable to a municipality 'when execution of a government's policy or custom . . . inflicts the injury.' " *Montano v. City of Chicago*, 535 F.3d 558, 570 (7th Cir. 2008) (citing *Monell*, 436 U.S. at 694, 98 S.Ct. 2018, and *Schlessinger v. Salimes*, 100 F.3d 519, 522 (7th Cir. 1996)); *Eversole v. Steele*, 59 F.3d 710, 715 (7th Cir. 1995) ("[M]unicipalities are answerable only for their own decisions and policies; they are not vicariously liable for

---

[8] (...continued)

speech, as alleged in the complaint, was not protected under the First Amendment.

the constitutional torts of their agents."). "A local govern-ment unit's unconstitutional policy or custom can be shown by: (1) an express policy causing the loss when enforced; (2) a widespread practice constituting a 'custom or usage' causing the loss; or (3) a person with final policymaking authority causing the loss." *Walker v. Sheahan*, 526 F.3d 973, 977 (7th Cir. 2008).

However, as we found above, Houskins failed to estab-lish that she was deprived of a constitutional right, where her speech was not constitutionally protected; therefore her claims that the Sheriff has a policy of retaliation and selective discipline fail.[9] *See King v. East St. Louis School Dist. 189*, 496 F.3d 812, 817 (7th Cir. 2007) ("It is well established that there can be no municipal liability based on an official policy under *Monell* if the policy did not result in a violation of [a plaintiff's] constitutional rights"); *Alexander v. City of South Bend*, 433 F.3d 550, 557 (7th Cir. 2006) (finding that a municipality defendant cannot be liable under *Monell* for a policy or custom of inadequately training and supervising its police officers, unless the defendant violated a constitutional guarantee); *Aguilera v. Baca*, 510 F.3d 1161, 1167, 1174 (9th Cir. 2007) (noting

---

[9] We also note that Houskins failed to present sufficient evidence that the Sheriff retaliated against her for using profan-ity, when Keith was in fact disciplined for his actions on that day. Shortly after Houskins filed a complaint against him, Keith was de-deputized. While initially Keith was not repri-manded for the incident in the parking lot, a command-channel review of the investigation decided Keith was responsible and suspended him for 29 days.

that if no constitutional violation occurred, the court need not consider qualified immunity or a claim brought pursuant to *Monell*); *Wilson v. Morgan*, 477 F.3d 326, 340 (6th Cir. 2007) (noting that if a jury found no constitutional violation by individual defendants, a county could not have been found liable under *Monell* for an allegedly unconstitutional custom or policy); *Segal v. City of New York*, 459 F.3d 207, 219 (2d Cir. 2006) ("[B]ecause the district court properly found no underlying constitutional violation, its decision not to address the municipal defendants' liability under *Monell* was entirely correct.") (citing *Monell*, 436 U.S. at 694, 98 S.Ct. 2018 (involving a policy that was "the moving force of the constitutional violation") and *City of Canton v. Harris*, 489 U.S. 378, 109 S.Ct. 1197, 103 L.Ed.2d 412 (1989) (involving a failure to train municipal employees that led to the constitutional injury)); *Hannah v. City of Overland, Mo.*, 795 F.2d 1385, 1392 n.5 (8th Cir. 1986) ("[S]ince the jury found no constitutional violations, we need not decide whether the actions taken by . . . police officers were pursuant to official municipal policy or custom, as required under *Monell* . . . in order to impose liability on a municipality.").

## B. Keith

Counts II and III of Houskins's complaint sought damages from Keith for assault and battery. At the April 11, 2005 status hearing, Keith moved to sever his case from the Sheriff's; the district court denied the motion. The court also denied Keith's second motion to sever on May 2, 2005, stating that Keith had forfeited the issue by failing

to object to the final pre-trial order, and that any exhibits relevant to Houskins's claims against the Sheriff and not Keith would be subject to limiting instructions to the jury. At trial, Keith testified on his own behalf, stating that he did not hit Houskins because he does not "disrespect women," and that Houskins was in fact the instigator. The jury believed differently and found him liable on both counts. Houskins was awarded $10,000 in compensatory damages and $50,000 in punitive damages against Keith. On March 13, 2006, Keith filed a motion to set aside the verdict or to grant a new trial, which was denied by the district court on May 12, 2006.

On appeal, Keith argues that (1) the district court erred in exercising supplemental jurisdiction over the state law assault and battery claims against him; (2) the district court erred by denying Keith's motion to sever the trial; (3) the district court judge made comments throughout the trial that denied him a fair trial; and (4) the punitive damage award of $50,000 was excessive. We shall briefly address each argument in turn, but before doing so, we note that Keith failed to preserve other arguments for appeal. Keith complains that the jury instructions were erroneous, however he failed to challenge the instructions below, which constitutes waiver of that challenge and precludes appellate review. *Chestnut v. Hall*, 284 F.3d 816, 819-20 (7th Cir. 2002) (emphasizing that Federal Rule of Civil Procedure 51 "requires not only that objections to jury instructions be made in a timely fashion and on the record, but also with sufficient specificity to apprise the district court of the legal and factual basis for any perceived defect" and "unlike in a criminal trial,

there is no plain error analysis in a civil trial."). In addition, Keith challenges statements made during Houskins's closing argument, arguing that the comments erroneously tainted him with the Sheriff's wrongdoing, and thus prevented him from receiving a fair trial. However, again, Keith has waived this argument because he failed to object these statements at the time they were made, thus failing to preserve the argument on appeal. *See Soltys v. Costello*, 520 F.3d 737, 745 (7th Cir. 2008).

We now turn to Keith's challenge that the district court erred in asserting supplemental jurisdiction under 28 U.S.C. § 1367 over the state assault and battery claims against him, because there was no connection between those state claims and the federal claim against the Sheriff under § 1983. We review a district court's supplemental jurisdiction ruling under 28 U.S.C. § 1367(a) *de novo*. *Groce v. Eli Lilly & Co.*, 193 F.3d 496, 499 (7th Cir. 1999). Article III jurisdiction under § 1367(a) must be examined even if raised for the first time on appeal, as opposed to the discretionary exercise of supplemental jurisdiction by the court under § 1367(c), which is waived if not raised in the district court. *See International College of Surgeons v. City of Chicago*, 153 F.3d 356, 366 (7th Cir. 1998).

A district court has supplemental jurisdiction over the state claims against Keith pursuant to § 1367(a) "so long as they 'derive from a common nucleus of operative fact' with the original federal claims." *Wisconsin v. Ho-Chunk Nation*, 512 F.3d 921, 936 (7th Cir. 2008). A loose factual connection is generally sufficient. *Baer v. First Options of Chicago, Inc.*, 72 F.3d 1294, 1299 (7th Cir. 1995). Keith

contends that Houskins's claim against Keith is a "factually discrete argument over a parking space which resulted in [Houskins's] claim for personal injuries." The state claims brought by Houskins pertained to the same set of circumstances at issue in the federal claim. The crux of Houskins's federal claim was that she was disciplined in retaliation for filing a grievance and police report against Keith, stemming from Keith's assault on her in the parking lot, which was the crux of the state law claim. Moreover, in order to decide whether the Sheriff's internal investigation was legitimate, the jury needed to consider Keith's assault on Houskins and the subsequent discipline of both Keith and Houskins. The district court properly asserted supplemental jurisdiction.

Next, Keith argues that under Fed. R. Civ. P. 42(b), the court erred in denying the motion to sever his trial from the Sheriff. Keith believes that he was subjected to substantial prejudice, when it was alleged during trial that Keith was intimately connected with the Sheriff's policy through "clout" or "influence." Keith questions whether the jury punished Keith for the assault and battery or for his alleged association with an unproven ability to influence the Sheriff not to punish him for the assault and battery. Houskins's brief fails to respond to this argument.

The ultimate decision to order a separate trial under Rule 42(b) is at the court's discretion and will be overturned only upon a clear showing of abuse. *Housman v. United States Aviation Underwriters*, 171 F.3d 1117, 1121 (7th Cir. 1999). Rule 42(b) provides for separate trials where the efficiency of a consolidated trial is outweighed

by its potential prejudice to the litigants. The court must balance considerations of convenience, economy, expedition, and prejudice, depending on the peculiar facts and circumstances of each case.

We cannot say that the district court abused its discretion in finding that Keith's motion was "empty of merit"; clearly there was an overlap in the facts, evidence, and witnesses required for Houskins's claims against Keith and the Sheriff. Further, the court gave limiting instructions to the jury, stating "[the jury] should be aware that [it] ha[s] to give separate consideration to each claim and to each party in the case. There are two defendants, but it doesn't follow that if one is liable the other is also liable . . . [y]ou look at each one." Later, the court reminded the jury that "[e]ach defendant . . . must be considered separately." The Supreme Court has noted that our trial system "relies upon the ability of a jury to follow instructions." *Opper v. United States*, 348 U.S. 84, 95, 75 S.Ct. 158, 99 L.Ed. 101 (1954). In the end, Keith has failed to demonstrate any prejudice.

Keith also maintains that comments made by the district court judge denied him a fair trial. Specifically, Keith argues that the judge overruled objections by his counsel in a sarcastic manner in the presence of the jury, and he believes the jury was biased toward Houskins as a result of the judge's comments. We have considered all of the judge's statements that Keith has mentioned on appeal, and find any argument of bias to be without merit. The judge's admonitions to Keith's counsel about his method of questioning on cross-examination, as well as

his improper objections, were within his mandate as a federal trial judge. Even if the comments were made with obvious frustration in front of the jury, they "do not indicate any bias against [Keith], but a legitimate concern for the manner and mode of the presentation of evidence*." M.T. Bonk Co. v. Milton Bradley Co.*, 945 F.2d 1404, 1409 (7th Cir. 1991); Fed. R. Evid. 403, 611.

Finally, Keith appeals the jury's award of punitive damages, claiming the district court erred by refusing to reduce the $50,000 punitive damage award against Keith or grant a new trial on the issue of damages. Keith advances many new arguments regarding the punitive damage award on appeal, however we only address the arguments he raised below. *See Belom v. National Futures Ass'n*, 284 F.3d 795, 799 (7th Cir. 2002). We review the district court's decision not to grant a remittitur or a new trial on damages for an abuse of discretion. *Farfaras v. Citizens Bank and Trust of Chicago*, 433 F.3d 558, 566 (7th Cir. 2006). While "it is inevitable that the specific amount of punitive damages awarded whether by a judge or by a jury will be arbitrary . . . [t]he proper judicial function is to police a range, not a point." *Mathias v. Accor Economy Lodging, Inc.*, 347 F.3d 672, 678 (7th Cir. 2003). The gist of Keith's argument in the district court was that the damages were excessive in light of the evidence, and the jury may have been confused as to how to assess the damages in light of the fact that Houskins asked the jury for $5,000 in damages for the battery. The district court did not abuse its discretion in finding that Keith's challenge to the award was essentially that the jury should have believed his testimony over Houskins's and

the other witnesses that testified against Keith. In addition, "the jury is entitled to disregard the amount of damages requested by a party, especially when evidence is introduced from which jurors could draw their own conclusions." *Carter v. Chicago Police Officers*, 165 F.3d 1071, 1082 (7th Cir. 1998).

### III. CONCLUSION

For the foregoing reasons, we AFFIRM the judgment and award against Keith. The issue of whether Houskins's speech was constitutionally protected was a matter of law that the district court failed to address, and because we find that Houskins was speaking as an employee of the Sheriff and about personal grievances, we conclude that the district court erred in denying the Sheriff's motion for summary judgment. We also find that Houskins's *Monell* claim necessarily fails because Houskins's constitutional rights were not violated. Accordingly, the judgment of the district court against the Sheriff is REVERSED, and the case is REMANDED to the district court with instructions to enter judgment for the Sheriff.